**WILLIAM L. COULTHARD, ESQ.**
Nevada Bar No. #3927
Coulthard Law PLLC
840 South Rancho Drive #4-627
Las Vegas, Nevada 89106
(702) 898-9944
wlc@coulthardlaw.com

*Attorneys for Creditor Charles J. LaDuca*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. BK-S-21-12443-NMC |
| MONEYLINE ANALYTICS, LLC, | Chapter 7 |
| Debtor. | **NOTICE OF ISSUANCE OF SUBPOENA DUCES TECUM TO MATTHEW TURNIPSEEDE** |

**TO:  ALL INTERESTED PARTIES AND THEIR RESPECTIVE COUNSEL:**

PLEASE TAKE NOTICE that pursuant to FRCP 45(a)(4), Creditor Charles J. LaDuca ("Creditor"), by and through his counsel, William L. Coulthard of Coulthard Law, intends to serve a subpoena duces tecum upon Matthew Turnipseede in the form attached as Exhibit 1.

Dated this 28th day of October, 2021.

Respectfully submitted,

By:    /s/ William L. Coulthard
William L. Coulthard, Esq.
Nevada Bar No. #3927
Coulthard Law PLLC
840 South Rancho Drive #4-627
Las Vegas, Nevada 89106
(702) 898-9944
wlc@coulthardlaw.com

*Attorneys for Creditor Charles J. LaDuca*

COULTHARD LAW, PLLC
840 South Rancho Drive #4-627
Las Vegas, Nevada 89106
(702) 989-9944

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court via the electronic filing system on the 28th day of October, 2021.

| | |
|---|---|
| Zachariah Larson | Bradley G. Simms |
| LARSON & ZIRZOW, LLC | HOUMAND LAW FIRM, LTD. |
| 850 E. Bonneville Ave. | 9205 West Russell Road |
| Las Vegas, NV 89101 | Bldg. 3, Suite 240 |
| (702) 382-1170 | Las Vegas, NV 89148 |
| zlarson@lzlawnv.com | (702) 720-3370 |
| *Attorney for Debtor, Moneyline Analytics, LLC* | bsims@houmandlaw.com |
| | *Attorney for Trustee, Shelley D. Krohn* |

I certify that some of the participants in this case may be registered electronic filing systems users and will be served electronically. For those participants in the case that are not registered electronic filing system users, service was made by depositing a copy of the above-referenced document for mailing in the United States Mail, first-class postage prepaid, at Las Vegas, Nevada to the following unregistered participants: N/A.

/s/ Tami J. Reilly
Tami J. Reilly, a representative
Of Coulthard Law, PLLC

COULTHARD LAW, PLLC
840 South Rancho Drive #4-627
Las Vegas, Nevada 89106
(702) 989-9944

# EXHIBIT 1

# EXHIBIT 1

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

District of _NEVADA_

In re MONEYLINE ANALYTICS, LLC
_____
Debtor

*(Complete if issued in an adversary proceeding)*

Case No. BK-S-21-12443-NMC

Chapter 7

_____
Plaintiff

v.

_____
Defendant

Adv. Proc. No. _____

## REVISED

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)**

To: Matthew Turnipseede
_____
*(Name of person to whom the subpoena is directed)*

☑ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| PLACE Coulthard Law PLLC, 840 S. Rancho Dr., #4-627, Las Vegas, NV 89106 | DATE AND TIME |
|---|---|
| If documents are received prior to 11/15/21, personal appearance is not required | Wednesday, Nov. 15, 2021, 5:00 p.m. |

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 10/28/2021

CLERK OF COURT

OR

_____        _William L. Coulthard_
Signature of Clerk or Deputy Clerk            *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Creditor Charles J. LaDuca
_____ , who issues or requests this subpoena, are:
William L. Coulthard, Esq., Coulthard Law, PLLC, 840 S. Rancho Dr., #4-627, Las Vegas, NV 89106, (702) 898-9944

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on (*date*) _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


      I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
                              *Server's signature*

_____
                             *Printed name and title*

_____
                              *Server's address*


Additional information concerning attempted service, etc.:

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

### AMENDED EXHIBIT A

### DEFINITIONS

1. "**Bankruptcy Case**" means the following case and all jointly administered cases, if applicable: Moneyline Analytics, LLC, United States Bankruptcy Court for the District of Nevada, Case No. BK-S-21-12443-nmc.

2. All definitions and instructions set forth in the Federal Rules of Civil Procedure 26 and 33 shall apply herein.

3. The definitions and instructions as set forth in the Local Rules of the United States Bankruptcy Court for the District of Nevada are adopted and treated as if fully set forth herein.

4. "**Moneyline**" means Moneyline Analytics, LLC and all of its affiliates, agents, attorneys, employees, representatives, and any other people acting on its behalf in the Bankruptcy Case.

5. "**Edgewize**" means Edgewize, LLC and all of its affiliates, agents, attorneys, employees, representatives, and any other people acting on its behalf in the Bankruptcy Case.

6. "**Fusion Capital**" means Fusion Capital, LLC and all of its affiliates, agents, attorneys, employees, representatives, and any other people acting on its behalf in the Bankruptcy Case.

7. "**Moneyline Dublin**" means Moneyline Dublin and all of its affiliates, agents, attorneys, employees, representatives, and any other people acting on its behalf in the Bankruptcy Case.

8. "**Edge Sports Analytics**" means Edge Sports Analytics, LLC and all of its affiliates, agents, attorneys, employees, representatives, and any other people acting on its behalf in the Bankruptcy Case.

9. The term "**Account**" includes, but is not limited to, any depository, credit card, loan, payment processing, payment facilitating, investment, and/or brokerage account.

10. "**Acquirer**" or "**Acquiring Bank**" means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system (e.g., VISA, Inc., Mastercard Inc., American Express Company, and Discover Financial Services, Inc.) to authorize merchants to accept, transmit, or process payment by credit card through the credit card system for money, goods or services, or anything of value.

11. "**And**" as well as "**or**" shall be construed disjunctively or conjunctively as necessary in order to bring within the scope of the request all responses which otherwise might be construed to be outside its scope.

12. "**All**" and "**any**" mean "any and all" and the word "**including**" means "including without limitation."

13. "**Authentic**" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Evidence 901 and 902.

14. "**Bank**" means a financial institution that is defined by the Federal Financial Institutions Examination Council as subject to its uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System ("FRB"), the Federal Deposit Insurance Corporation ("FDIC"), the National Credit Union Administration ("NCUA"), the Office of the Comptroller of the Currency ("OCC"), and the Consumer Financial Protection Bureau ("CFPB") or as subject to its recommendations to promote uniformity in the supervision of financial institutions by the Board of Governors of the Federal Reserve System ("FRB"), the Federal Deposit Insurance Corporation ("FDIC"), the National Credit Union Administration ("NCUA"), the Office of the Comptroller of the Currency ("OCC"), and the Consumer Financial Protection Bureau ("CFPB").

15. "**Bank Secrecy Act/Anti-Money Laundering Compliance Program**" or "**BSA/AMLP**" means the written Bank Secrecy Act/Anti-Money Laundering compliance program established by the Defendant and approved by the Defendant's board of directors, as set forth in the FFIEC Examination Manual or otherwise adopted, approved, implemented or in effect at any time between August 1, 2013 to October 1, 2021.

16. "**Customer Identification Program**" or "**CIP**" means the Defendant's customer identity verification protocols and procedures, approved by the Defendant's board of directors, as set forth in the FFIEC Examination Manual, or otherwise adopted, approved, implemented, or in effect at any time between August 1, 2013 to October 1, 2021.

17. "**CIP Bank Audit and Training Programs**" or "**CIP/ATP**" means the Defendant's CIP audit and training programs, approved by the Defendant's board of directors, as set forth in the FFIEC Examination Manual, or otherwise adopted, approved, implemented, or in effect at any time between August 1, 2013 to October 1, 2021.

18. "**KYC**" or "**Know Your Client**" refers to the Defendant's written Know Your Customer (KYC) program, practices, and procedures, approved by the Defendant's board of directors, as set forth in the FFIEC Examination Manual, or otherwise adopted, implemented, or in effect at any time during January 1st, 2015 to present and on a continuing basis.

19. "**Communication**" means, without limitation, the oral or written exchange, transfer, or dissemination of information of any kind regardless of the means or medium by which it is accomplished, such as electronic communications, e-mails, facsimiles, telephone communications, correspondence, exchange of written or recorded information, or face-to-face meetings, and the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

20. The phrase "**Communication between**" is defined to include instances where one party addresses the other party, but the other party does not necessarily respond.

21. "**Customer Due Diligence**" means all activities taken relating to Defendant's internal requirements, programs, activities, practices, protocols, and standards, pursuant to the BSA/AMLP, CIP, CIP/ATP, KYC, Patriot Act and FFIEC Examination Manual compliance

or otherwise adopted, approved, implemented, or in effect at any time between January 1st, 2015 to present.

22. "**Declarant**" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Evidence 801(b).

23. "**Document**" or "**Documents**" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Civil Procedure 34(a), including, but not limited to means all writings of any kind, including the originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, including but not limited to correspondence, memoranda, notes, diaries, desk or other calendars, statistics, letters, telegrams, minutes, business records, personal records, account statements, bank statements, contracts, reports, studies, checks, receipts, invoices, bills, returns, charts, summaries, pamphlets, books, interoffice and intra-office communications, notations of any sort of conversations, written agreements, bulletins, printed matter, computer print-outs, teletypes, telefax, worksheets, all drafts, alterations, modifications, changes, and amendments of any of the foregoing graphic or oral records or representations of any kind (including, without limitation, tapes, cassettes, discs, recordings, and computer memories). It includes the terms "writings," "recordings," "photographs," "originals" and "duplicates" as those terms are used in Rule 1001 of the Federal Rules of Evidence and specifically includes electronically stored information.  A draft or nonidentical copy is a separate document within the meaning of this term.

24. "**Duplicate**" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Evidence 1001(e).

25. The term "**during**" means at some time or point during, throughout the duration, continuance, or existence of, or concurrently with a given period.

26. A request to "**describe**" any oral statement or communication is a request to state:

    a. The name and address of each individual making such statement or communication.

    b. The name of any principal or employer whom or which such individual was thereby representing and the position in which such individual was then employed or engaged by such principal or employee.

    c. The name and address of the individual or individuals to whom the oral statement or communication was made, and the name of any principal or employer whom such person or persons were representing at the time of and in connection with such oral statement or communication, as well as the employment position in which they were then employed or engaged.

    d. The names and addresses of any other individuals present when such oral statement or communication was made or who heard or acknowledged hearing the same.

    e. The place where such oral statement or communication was made.

3

f.   A brief description of the contents of such oral statement or communication.

27. "**Defendant(s)**" includes its partners, corporate parent, subsidiaries, or affiliates, and its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including, without limitation, any organization or entity which the responding Defendant(s) manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of the responding Defendant(s).

28. "**Enhanced Due Diligence**" or "EDD" shall refer to process(es) the Defendant uses to initiate and conduct closer scrutiny of higher-risk customers, as described in the Federal Financial Institutions Examination Council (FFIEC) Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) Examination Manual and in Financial Crimes Enforcement Network et al., Guidance on Obtaining and Retaining Beneficial Ownership Information, Joint Release FIN-2010-G001, at 3 (March 5, 2010).

29. "**Entity**" means business, legal, or governmental entity or association, however organized.

30. A request to "**Explain Fully**" any answer, denial, or claim is a request (insofar as may be applicable) to:

a.   State fully and specifically each fact and/or contention in support of your answer, denial, or claim; and

b.   For each such fact or contention, to identify each person who has knowledge relative to that fact or contention, each document that tends to support that fact or contention, and each document that tends to dispute that fact or contention.

31. "**FFIEC**" shall refer to the Federal Financial Institutions Examination Council (FFIEC) established on March 10, 1979, pursuant to title X of the Financial Institutions Regulatory and Interest Rate Control Act of 1978 (FIRA).

32. "**FFIEC Examination Manual**" shall refer to the Federal Financial Institutions Examination Council (FFIEC) Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) Examination Manual.

33. "**Financial Services Provider**" means a provider of financial services and includes, for purposes of the inquiries set forth herein, any bank, credit union, payment processor, payment facilitator, Independent Sales Organization (ISO), Independent Sales Agent (ISA), credit and/or debit card payment organization, investment-related services provider, and any person or organization defined as a Financial Institution by the Bank Secrecy Act.

34. "**Identify**" when referring to a person means to give, to the extent known, the person's full name, present or last known address, and, when referring to a natural person, the present or last known place of employment. Once a person has been identified in accordance with this subsection, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

4

35. "**Identify**" when referring to documents means to give to the extent known, the (A) type of document; (B) general subject matter; (C) date of the document; and (D) author(s), addressee(s), and recipient(s).

36. "**Meeting**" means the contemporaneous presence of two or more natural Persons, whether in person or telephonically, whether such coincidence of presence was by chance or pre-arranged, and whether the meeting was formal or informal or occurred in connection with some other activity.

37. "**Money Laundering**" means the movement of money after it was received by MONEYLINE ANALYTICS, LLC, or You,  including, but not limited to, payments to others through MONEYLINE ANALYTICS, LLC,, and those who otherwise assisted them for the purpose of making the money generated by MONEYLINE ANALYTICS, LLC,'s business appear to have come from a legitimate source or to place money outside the reach of US regulators or jurisdiction or the concealment of the origins of illegally obtained money, typically by means of transfers involving foreign banks or legitimate businesses or placing money outside the reach of US regulators and jurisdiction.

38. "**Net Loser**" refers to a participant who received less from MONEYLINE ANALYTICS, LLC, and other participants than they paid to MONEYLINE ANALYTICS, LLC, and other participants.

39. "**Net Winner**" refers to a participant who received more from MONEYLINE ANALYTICS, LLC, and other participants than they paid to MONEYLINE ANALYTICS, LLC, and other participants

40. "**Participants**" means those who executed a MONEYLINE ANALYTICS, LLC, Template Contract or who tendered money to MONEYLINE ANALYTICS, LLC.

41. "**Payment Processing**" shall mean directly or indirectly providing a merchant with access, through any third-party depository financial institution (TPDFI), to payment mechanisms that allow consumers to purchase the merchant's goods or services by debiting a consumer's bank account or charging a consumer's credit card account. Payment processing may include, among other things, providing a merchant with the means to electronically accept and transmit consumer payments through any TPDFI; monitoring, tracking, and reconciling payments, returns, and chargebacks; providing pre-authorization, post-authorization, and refund services to merchants; and disbursing funds receipts to merchants.

42. "**Payment Processor**" means a person or organization that provides payment processing services.

43. "**Payment Processing Facilitator**" or "**Payment Facilitator**" means a person or organization that provides payment processing services to multiple merchants by means of its own merchant processing account with an acquirer.

44. "**Person**" means any natural person or any business, legal, or governmental entity or association, however organized.

45. "**Red Flag(s)**" means your internally observed indicators that signal a need to investigate a customer, restrict a customer's banking or pay processing privileges, suspend banking or pay processing services, close a customer's account, or generate a SARS report.

46. "**Relatives**" or "**Relatives in Law**" means all relatives including but not limited to parents, siblings, siblings in law, children, stepchildren, and their next of kin and also including each business entity that they own, control or have an interest in.

47. "**Risk Profile**" shall refer to the customer risk profile developed through customer risk assessment as part of the CDD or EDD process, as set forth in the FFIEC Examination Manual.

48. "**Relating to**", "**referring to**", "**regarding**", "**concerning**" or any derivative thereof, in addition to their customary and usual meanings, means concerning, constituting, containing, describing, discussing, embodying, evidencing, identifying, illustrating, pertaining to, assessing, recording, relating to, referring to, regarding, supporting, negating, refuting, touching upon and/or summarizing.

49. The "**Scheme**" means the MONEYLINE ANALYTICS, LLC, pyramid/Ponzi scheme including its on going operatins that are the subject of this litigation.

50. "**Statement**" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Evidence 801(a) and includes any Communication

51. "**Suspicious Activity Report**" or "**SARS**" shall refer to a Suspicious Activity Report as set forth in 12 CFR 21.11.

52. "**MONEYLINE ANALYTICS, LLC**" or "**MONEYLINE ANALYTICS, LLC Related Entities**" means individually or collectively the entities known as MONEYLINE ANALYTICS, LLC, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics as well as Mathew Turnipseed and Sonya Turnipseed as well as their officers, directors, agents, employees, attorneys, investigators, consultants, and anyone else acting on their behalf.

53. "**Template Form Contract**" and "**Standard Form**" or "**Template Contract**" means MONEYLINE ANALYTICS, LLC standard form contract.  See Attachment 1.

54. "**You**" means Matthew Turnipseede and all of your owned or controlled companies affiliates, agents, attorneys, employees, representatives, predecessors, successors, subsidiaries, , including, without limitation, any organization or entity which you manages or control, together with all your present and former employees, agents, representatives or any persons acting or purporting to act on your behalf.

55. "**USA Patriot Act Section 314(b)**" or "**Patriot Act**" means the law which permits financial institutions, upon providing notice to the United States Department of the Treasury, to share information with one another to identify and report to the federal government activities that may involve money laundering or terrorist activity.

## <u>INSTRUCTIONS</u>

1. Unless otherwise specified, the requested documents shall cover the time period since January 1, 2015, to the present and continuing.

2. In responding to these document requests, please furnish all information that is available to you or subject to your control, including information in the possession, custody, or control of your officers, directors, employees, representatives, consultants, agents, servants, attorneys, accountants, or any person who has served in any such role at any time, as well as corporate parents, subsidiaries, affiliates, divisions, predecessor companies or proprietorships, any joint venture to which you are a party, and other persons acting on your behalf.

3. Specific request is made pursuant to Fed. R. Civ. P. 26(e) that you supplement your responses at any time should your response to any inquiry not be currently complete.

4. Be clear that you have a duty to reasonably amend or supplement a prior response if you obtain information that leads you to believe that a response was incorrect when made, or that response though correct when made, is no longer true.

5. Furthermore, you are required to supplement your response with respect to any requests directly addressed to the identity and location of persons having knowledge of discoverable matters as well as any request directly addressed to the identity of each person expected to be called as an expert witness at trial, the subject matter on which he or she is to testify, and the substance of his testimony.

6. Whenever reference is made to a person, it includes all such person's principals, employees, agents, attorneys, consultants, and all other representatives.

7. Whenever reference is made to an entity, it includes all such entity's parents, subsidiary's, affiliates, principals, employees, agents, attorneys, consultants, and all other representatives.

8. Identify the present location of any document you are unable to produce in answer to any of the document requests.

9. If your response to any request herein is that the information sought is not in your possession or custody, describe in detail and Explain Fully the unsuccessful efforts you made to obtain such documents.

10. If object to any request for documents herein based on a claim of any privilege or immunity from disclosure, please identify the following information for all information so withheld and Explain Fully:

    a. The type of information (e.g., contents of attorney-client telephone call);
    b. The date of any meeting or conversation you claim is privileged or otherwise immune from disclosure;
    c. The persons present at any meeting or conversation you claim is privileged or otherwise immune from disclosure;
    d. The general subject matter of the information;

    e.   The nature of the privilege or immunity asserted; and

    f.   A brief explanation of why the information is believed to be privileged or immune from production.

11. If you cannot fully comply with any request for production, comply to the maximum extent possible and Explain Fully: (a) what information you are unable to or refuse to and (b) why full compliance is not possible.

12. If you object to any request for production or subpart thereof, state with specificity the grounds for each such objection.

13. Each document produced by you in response should include a unique production number.

## DOCUMENTS TO BE PRODUCED

1. All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Sonya Turnipseede relating to, in any way, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

2. All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Brett Lovett relating to, in any way,  Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

3. All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Clayton Graham relating to, in any way,  Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

4. All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Sarat Kusuma relating to, in any way,  Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

5. All communications including but not limited to text messages, indicia of phone calls,  and emails between Matthew Turnipseede and Arvind Mody relating to, in any way,  Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

6. All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Devin Mody relating to, in any way,  Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

7. All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Amish Shah relating to, in any way,  Edgewize,

Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

8.  All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Divya Shah relating to, in any way, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

9.  All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Kimberly Starr relating to, in any way, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

10.  All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Vithal Kusuma relating to, in any way, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

11.  All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Rajesh Wallace relating to, in any way, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

12.  All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Peter Yribar relating to, in any way, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

13.  All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Greg Sidoris relating to, in any way, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

14.  All communications including but not limited to text messages and emails between Matthew Turnipseede and Jennifer North relating to, in any way, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

15.  All communications including but not limited to text messages and emails between Matthew Turnipseede and Geoff Verhoff relating to, in any way, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

16.  All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and Financial Intuitions (including each Acquiring and Merchant Bank) relating to, in any way, you, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015, to present.

17. All communications including but not limited to text messages indicia of phone calls, and emails between Matthew Turnipseede and each Pay Processors relating to, in any way, you Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015, to present.

18. All communications including but not limited to text messages indicia of phone calls, and emails between Matthew Turnipseede and each business entity and operations consultant relating to, in any way, you, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015, to present.

19. All communications including but not limited to text messages indicia of phone calls, and emails between Matthew Turnipseede and each licensed professional such as Certified Public Accountants and attorneys relating to, in any way, you, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015, to present.

20. All communications including but not limited to text messages, indicia of phone calls, and emails between Matthew Turnipseede and each technology consultant relating to, in any way, you, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015, to present.

21. All communications including but not limited to text messages indicia of phone calls, and emails between Matthew Turnipseede and each state or federal agency or department relating to, in any way, to Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

22. All communications including but not limited to text messages indicia of phone calls, and emails between Matthew Turnipseede and each state or federal agency or department, including the SEC, the Justice Department, the FBI, the Nevada Gaming Commission relating to, in any way, to Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015, to present.

23. All communications including but not limited to text messages indicia of phone calls, and emails between Matthew Turnipseede and Moneyline Investors or Participants (Members and/or Investors in Moneyline who were given a K-1 during the tax return years from 2013-2020) relating to, in any way, to Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015, to present.

24. All communications including but not limited to text messages indicia of phone calls, and emails between Matthew Turnipseede and all other persons or entities not specified above relating to, in any way, to Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1st, 2015 to present.

25. All indicia of persons or entities who were issued a 1099, W9 or K1 tax form from 2015 – this date for Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics.

26. All bank statements from Wells Fargo bank or each other financial institution that accounts were opened in the name of: 1.) Matthew Turnipseede, 2.) Sonya Turnipseede, 3.) Moneyline Analytics, 4.) Fusion Capital, LLC, 5.) Edge Sports Analytics from January 1, 2015 to present.

27. All statements from each Pay Processor for accounts in the name of: 1.) Matthew Turnipseede, 2.) Sonya Turnipseede, 3.) Moneyline Analytics, 4.) Fusion Capital, LLC, 5.) Edge Sports Analytics from January 1, 2015 to present.

28. To the extent not already requested and produces above, all documents including the applications submitted by Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics to open, maintain or close accounts with financial institutions and pay processors including all supporting documents and responses to Know Your Client inquiries and questionnaires.

29. All communications relating to any Financial Institution, Pay Processor, attorney, CPA, and all other consultants' willingness or refusal to perform services for you, Edgewize, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics.

30. All documents that describe the financial and/or business plan of Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics.

31. All financial records, financial statements, profit and loss reports of Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics.

32. All communications between Matthew Turnipseede and Moneyline Analytics investors including any information describing Moneyline Analytics business operations and projected return on investments contributed/provided to Moneyline Analytics investors.

33. All tax returns since their inception for: 1.) Moneyline Analytics, 2.) Fusion Capital, 3.) Moneyline Dublin, 4.) Edge Sports Analytics.

34. All personal tax returns for Matthew Turnipseede for years 2015, 2016, 2017, 2018, 2019, 2020 and 2021.

35. All personal tax returns for Sonya Turnipseede for years 2015, 2016, 2017, 2018, 2019, 2020 and 2021.

36. Each credit card or debit card statement in the name of Matthew Turnipseede, Sonya Turnipseede, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1, 2015, to present where the following charges are on those statements:

    a. W8TECH_*SA

    b. W8TECH SA 775-4504856 NV

    c. W8Tech.com*SA

    d.  W8TECH SA LAS VEGAS NV 775-450-4856

    e.  w8tech* 775-450-4856

37. To the extent not already produced, each credit card or debit card statement in the name of Matthew Turnipseede, Sonya Turnipseede, Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics from January 1, 2015, to present

38. All evidence of wager placement as described in the Moneyline Analytics Business Plan for January 1, 2016, to present.

39. All evidence of wager payouts as described in the Moneyline Analytics Business Plan for January 1, 2016, to present.

40. All evidence that the COVID 19 epidemic adversely affected or benefited the business and revenue stream of Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics.

41. All documents or other indicia showing, evidencing or establishing that Matthew Turnipseede has been banned from placing sports wagers at any William Hill Sportsbooks or kiosks.

42. Documents that were submitted to the accountant of record that filed the Moneyline Analytics tax returns for 2016, 2017, 2018, 2019, 2020 and 2021. These are the documents that the Accountant of Record based their filings on in each of those years.

43. The law firm opinion that Matthew Turnipseede used for his investment presentations from the Lane Alton law firm in Columbus, Ohio.

44. Each accounting and booking report, including but limited to weekly, monthly, quarterly and yearly Profit and Loss statements, as requested by or provided to Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics.

45. All documents submitted to the law firm of Lane Alton law firm in Columbus, Ohio.

46. All communications by payment processors, financial institutions, licensed professionals or other consultants and each state or federal agency or department, including the SEC, the Justice Department, the FBI, the Nevada Gaming Commission relating to, in any way, any suspicion, allegation or opinion that Moneyline Analytics, Fusion Capital, Moneyline Dublin, and Edge Sports Analytics was involved in an illegal or fraudulent activity, including but not limited to a Ponzi or pyramid scheme.

47. All documents through which you became aware that Moneyline Analytics, Fusion Capital, Moneyline Dublin, or Edge Sports Analytics were involved in an unlawful business operation.

48. Each document that evidences the identity or existence of a witness to the business operations of Moneyline Analytics, Fusion Capital, Moneyline Dublin, or Edge Sports Analytics, including but not limited to day to day or occasional financial or administrative operations.

49. Wells Fargo Checking Account Monthly Bank Statements for Account ending in 3172 (Matt Turnipseede) from 2015 to the present;

50. Wells Fargo Checking Account Monthly Bank Statements for Account ending in 3198 (Matt Turnipseede) from 2015 to the present; and,

51. Wells Fargo Checking Account Monthly Bank Statements for Account ending in 3180 (Matt Turnipseede) from 2015 to the present.

52. Personal Tax Returns filed with the IRS for Matt and Sonja Turnipseed from 2015 to the present.

Attachment 1

Attachment 1

**Moneyline Analytics, LLC**

# Investor Information & Operating Agreement



| | |
|---|---|
| **Date:** | XXX, X 2020 |
| **Prepared by:** | Matthew J. Turnipseede |
| | President |

# MLA Operating Agreement

## Purpose of the Operating Agreement

This document was designed for **xxxxxxxxx** here as known as ("**XX**") to have as an understanding as to how Moneyline Analytics, LLC ("MLA") will operate from June 1, 2020 – December 31, 2020. All questions can be directed to Company President and Managing Member of the Company, Matthew Turnipseede, hereby known as ("Matt") at (702) 217-0805, or at matt@moneylineanalytics.com.

### OPERATIONS:

MLA is a Limited Liability Company organized and maintained under the laws of the State of Nevada. Current leadership is comprised of one member, Matt, but proposes to admit **XX** (as a proportionate member) who will contribute cash to its capital for use in its business operations. Matt will remain the managing member at all times.  There, he will operate the Company by using the capital to place wagers on sporting events.  Matt will not be paid any compensation for the act of placing wagers.  **XX** and Matt will participate in the proportionate distributive shares of the Company's profits.  All wagers will be placed with betting parlors that are duly licensed with the Gaming Commission of the State of Nevada.  MLA proposes to accept capital contributions from **XX** and deposit them in a bank account maintained exclusively within the State of Nevada.  Matt will not disclose any information regarding wagers that may be placed until after the conclusion of the sporting event involved, in compliance with Nevada state law.  Matt will not place wagers using **XX**'s money on behalf of anyone other than **XX**.

## Management & Control

   a. ***Managing Member***.  The Managing Member of the Company will be Matthew J. Turnipseede.  The Company will be managed and controlled in accordance with this agreement.
   b. ***Books, records, and reports***.  Matt will maintain the books, records, and other documents required by the Law.  Matt will furnish to **XX** a monthly report starting in July 2020 and every month thereafter until the end of this contract on December 31, 2020, where the final report is issued.
   c. ***Conduct of Business***.  Matt agrees to use **XX**'s contributions to the best of his abilities, and in accordance with sound business practices, in a lawful manner, and to endeavor to preserve for the Company the goodwill of its suppliers, customers, employees, and others having relations with it.  **XX** has authorized Matt to utilize the following revenue streams to increase his earnings:  sports betting.
   d. ***Monthly Meetings***. Matt shall conduct a monthly meeting either in person or via phone to chart progress in reaching the goals of **XX**'s account.  This Agreement recognizes that it is critical for success that a monthly meeting take place to ensure best efforts are being utilized to reach the financial goals increasing **XX**'s fund.

## Distributions & Additions

   a. ***Determination of Net Income or Loss***. See Exhibit A
   b. ***Distributions of Net Income***.  Proportionate Members may take out their investment, or a portion of their investment, at any time.
   c. ***Making Additional Contributions***.  A Proportionate Member may add to their account at any time as well.

## Noncompetition, Trade secrets

    a.   ***Noncompetition.***  Each Shareholder in MLA agrees that as long as he or she is the owner, or in control of, any of the Company's shares, the Shareholder will not be employed, concerned, or financially interested, either directly or indirectly, in the same or a similar business as that conducted by the Company, or compete with the Company.  Unless otherwise agreed to in writing by a unanimous vote of the remaining Shareholders, a departing Shareholder will not be employed, concerned, or financially interested, either directly or indirectly, in the same or a similar business as that conducted by the Company, or compete with the Company, for a one-year period following the date the departing Shareholder conveys his or her shares if any customers of the same, similar, or competing business may be located within a 100 mile radius of the principle place of business of the Company.

    b.   ***Trade Secrets***.  Each Shareholder acknowledges that the customer lists, potential customer lists, trade secrets, processes, methods, and technical information of the Company and any other matters designated by the written consent of all Shareholders are valuable assets.  Unless he or she obtains the written consent of each of the other Shareholders, each Shareholder agrees never to disclose to any individual and organization, except in authorized connection with the business of the Company, any customer list, or any name on that list, or any trade secret, process, or other matter referred to in this paragraph while the Shareholder holds, or has the control of, any shares of the Company, or at any later time.

## Restrictions On Transfer

    a.   ***Restrictions on Transfer***.  To accomplish the purposes of this Agreement, any transfer, sale, assignment, hypothecation, encumbrance, or alienation of any of the share of the Company, other than according to the terms of this Agreement is void and transfers no right, title, or interest in or to those shares to the purported transferee, buyer, assignee, pledgee, or encumbrance holder.  Each Shareholder shall have the right to vote shares held of record and to receive dividends paid on them until the shares are sold or transferred in accordance with this Agreement.

    b.   ***Permitted transfers***.  A Shareholder may transfer all or any part of his or her shares to: (i) a spouse, ancestors or lineal descendants or the spouse of any such persons, (ii) to any trust solely for the benefit of the Shareholder or any of the foregoing persons, (iii) to a Shareholder, member, or partner of a Shareholder, or (iv) to a beneficiary of a trust that is a Shareholder, or (v) to a corporation, limited liability company, partnership or other entity controlled by the Shareholder, provided that each such permitted transferee shall first agree in writing to be bound by the terms and provisions of this Agreement.  A Shareholder may also transfer all, or any part of his or her shares if the Managing Member approves that transfer in writing.

    c.   ***Death, Disability, Incapacity of Manager to manage MLA***. In case of Matthew Turnipseede becoming deceased or is debilitated from carrying out his duties as Managing Member of Moneyline Analytics LLC, Sonya Turnipseede and/or Matthew Turnipseede's estate is responsible for returning Investor's funds that are in MLA. These include funds in bank accounts and casino applications that said funds are invested in for MLA. Mr. Turnipseede shall at all times have a list of all bank accounts and casino applications with investors' funds in it.  This list shall include name of banking institution and/or casino application, person's full name on account and/or application, passwords and/or information needed to access said accounts and/or applications, and shall be stored with a third party escrow agent and/or on a secure server.  This shall be updated monthly to reflect current amounts in each account and/or application.

**IN WITNESS WHEREOF**, the parties have signed this Agreement on the date above written.

**SHAREHOLDER:  XX**

_____

Initial Investment:

**MONEYLINE ANALYTICS, LLC**

_____
Matthew J. Turnipseede, Managing Member & President

**EXHIBIT A**

**Base Formula**

$**XX** investment
$**X** level* Could change pending the mutual agreement of Matt and **XX**
**X** staff members

**X** avg categories x $**X** per category = $**XXX**/day